GILDA APICELLA, as Administratrix of the Estate of VINCENT APICELLA, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 32487.)

Court of Claims, April 21, 1955.

*Irving Israel* and *Samuel L. Greenberg* for claimant.

*Jacob K. Javits, Attorney-General* (*David Marcus* of counsel), for defendant.

SYLVESTER, J.   On July 24, 1953, at Bellevue Hospital, New York City, claimant's intestate Vincent Apicella was examined by two psychiatrists who diagnosed his mental ailment as paranoid schizophrenia and duly certified him for admission to Manhattan State Hospital where he was received on July 31, 1953.   The decedent had commenced work when he was fourteen years of age, after reaching the eighth grade of elementary school.   At the age of nineteen, he married the claimant.   He worked at various occupations; he drove a truck and for six or seven years prior to his death, he operated a taxicab, working on commissions that netted him approximately $60 per week.

The psychiatric evidence establishes that his mental illness had its origin at least six years or so before his commitment and that it indicated a very poor prognosis.   There is no dispute here about the fact that the deceased expressed suicidal ideas and the doctors are fairly agreed that he was likely to attempt to destroy himself.   Besides his wife, he left four daughters, aged twenty-two, twenty, seventeen and nine years of age respectively.   It is claimed that there was a failure of adequate supervision of the deceased as well as a failure to take reasonable precautions for the safety of the deceased in the circumstances here presented.   The suicide occurred in a room in ward M-5 of the institution.   There were 77 disturbed patients housed in that ward which was known to be a ward for disturbed patients, who were known to have suicidal tendencies.   The ward, which

was 206 feet long, consisted of 34 rooms. There was a recess room at the south end where the patients were locked in. It appears that on August 13, 1953, between the hours of 1:00 and 1:30 P.M., the deceased was taken from that room to the X-ray Department in another building on the institution's grounds some distance away and was returned to ward M-5 at about 2:30 P.M. of the same day and that he was left standing in the ward unattended without being returned to the recess room. At about 3:15 P.M. of that day, the deceased was found hanging in one of the rooms located about 124 feet from the recess room. Assigned to ward M-5 were the head nurse and five attendants; however, at the time in question, there were only three attendants on the ward — two of whom were then in the locked recess room 124 feet away from the room where the decedent was found, the third attendant being somewhere about the corridor. Obviously, none of the attendants was within the range of observation of the decedent. In fact, it appears that he was left completely unguarded and unattended. This omission was characterized by a State psychiatrist as not being in accord with established institutional psychiatric practice. Indeed, considering the decedent's prior threats and attempts at self-destruction which his history revealed and which were known to the authorities at the institution, it is regarded that the measure of care and supervision exercised by the institution in that setting was plainly inadequate. It is found that the State was thereby negligent and will be required to respond in damages to the next of kin. The weight of the psychiatric testimony is to the effect that the chances of any remission in the decedent's mental condition, such as would enable him to take his place in society for any sustained period, were very poor. It was thought that he might be released from the institution from time to time on so-called convalescent parole, but that he would be likely to be returned; that ultimately he would be obliged to remain in the institution; that when released, he would not be able to follow his occupation as a taxicab operator or as a truckman for the reason that the stress of heavy work would more likely interrupt any improvement in his condition; and that, when and if released, it would be desirable that he should engage in lighter employment. As a taxi driver, he had earned about $60 a week. He was forty-four years of age at his death and his widow was then forty-two years old. Of course, one cannot say with any degree of certainty that the decedent, in view of the poor prognosis referred to, would have found profitable employment. On the other hand, it may not be assumed that he would not be able to find the lighter

employment suggested by the doctors. The possibilities of earnings were not altogether ruled out by them.

In this situation, and having regard to all the circumstances, it would seem appropriate to make an award as follows:

In the action for damages: Pain and suffering, $1,000.

In the death action, $8,500, with interest from August 13, 1953, to date of entry of judgment.

Judgment is directed accordingly. Findings may be submitted within fifteen days of the date hereof, otherwise this memorandum is to constitute the decision of the court.